## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
TANYA ALLEGRA MILLS,

                Plaintiff,

v.

ANADOLU AGENCY NA, INC.,

                Defendant.
```

No. 19-cv-3061 (EGS)

## MEMORANDUM OPINION[1]

Plaintiff Tanya Mills ("Ms. Mills") brings this action against Defendant Anadolu Agency NA, Inc. ("Anadolu") under the District of Columbia Payment and Collection of Wages Law ("DCPCWL"), DC Code § 32-1301 *et. seq.*, arising out of the termination of her employment. Ms. Mills alleges that Anadolu has not compensated her for her unused paid leave days upon her discharge. Pending before the Court is Anadolu's motion to dismiss. Upon careful consideration of the motion, the opposition, the reply thereto, the applicable law, and the entire record herein, the Court **GRANTS** Anadolu's Motion to Dismiss, ECF No. 12; and **DISMISSES WITHOUT PREJUDICE** Ms. Mills's DCPCWL claim.

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

I.    **Background**

       A. **Factual Background**

       The following facts reflect the allegations in the
operative complaint, which the Court assumes are true for the
purposes of deciding this motion and construes in Ms. Mills's
favor. *See Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir.
2015). Anadolu is a broadcasting company "under the ownership
and control of Anadolu Ajansi Turk A.S. ("A. A. Turk"), a
corporation owned and controlled by the government of Turkey."
*See* Am. Compl., ECF No. 10 at 1 ¶ 1. Ms. Mills alleges that on
"April 6, 2018, [she] entered into an employment contract with
A. A. Turk by signing an offer letter to work as an Executive
Producer in Turkey." *Id.* at 4 ¶ 8. The offer letter stated,
among other things, that Ms. Mills's compensation package
included "[p]aid leave – [a]nnual entitlement of 20 days plus
all Turkish national and public holidays, timing subject to
clearance with [Ms. Mills'] line managers." Offer Letter, Apr.
4, 2018 ("OL"), Def.'s Ex. 4, ECF No. 12-6 at 2.[2] In addition,
the offer letter stated "[j]urisdiction – [t]his agreement is

_____

[2] Though this action is not at the summary judgement stage,
"[w]here an attachment to a motion to dismiss is a document
'upon which the complaint necessarily relies, and because
plaintiff does not dispute its authenticity, the Court may
consider [it] without converting [the] motion to dismiss into a
motion for summary judgment.'" *Feld Entm't Inc. v. Am. Soc'y for
the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 323
(D.D.C. 2012).

subject to Turkish employment laws." *Id*.

However, upon her arrival in Turkey to begin her employment, Ms. Mills states that she was told that she would need to sign "a fixed-term consultancy agreement" in order to receive her salary since she did not have a Turkish work visa. *See* Am. Compl., ECF No. 10 at 4 ¶ 10. She further alleges that she was told that once she received her Turkish work visa, the consultancy agreement would no longer be necessary. *Id*. Nevertheless, Ms. Mills indicates that she signed a new "consultancy agreement approximately every 60 days" until the end of her employment. *Id*. at 5 ¶ 11. Each consultancy agreement, which specified that the agreement was between A. A. Turk as the "agency" and Ms. Mills, stated in relevant parts:

> The consultant is obliged to comply with the rules and regulations in the place where he tries to perform his services and, the standards of the Agency.
>
> The AGENCY agrees to pay [sic] net per month as service fee to the CONSULTANT who will be providing services under the Joint Broadcasting Project in order to provide a world class news production to be presented to the channel.
>
> The Consultant will never be considered as an employee of current Labor Laws in any case and at any time with this agreement. The services provided by the consultant [sic], are entirely professional and commercial, do not create any business relationship that give rise to the right to work in anyway.
>
> This agreement is the entire agreement between

> the parties in relation to the subject matter, invalidates and replaces all previous written or oral agreements, agreement samples, representations or proposals not contained in this agreement.
>
> The Agency shall have the right to end the contract at any given time.
>
> The Ankara Courts and enforcement offices shall be the exclusive authorized venues for the resolution of any matter of controversy or dispute between the parties relates there to.
>
> This agreement consists of fourteen (14) articles, two (2) pages and two (2) copies, one for each party.

*See* Consultancy Serv. Procurement Agreements ("Consultancy Agreement") May 15, 2018 – May 31, 2019, Def.'s Ex. 2, ECF No. 12-4 at 2-3. Ms. Mills notes that the "offer letter never mentioned a consultancy agreement and did not contain an expiration term." *See* Am. Compl., ECF No. 10 at 5 ¶ 11; *see generally*, OL, ECF No. 12-6.

On January 31, 2019, Ms. Mills returned to the United States, where she continued to sign a new consultancy agreement with A. A. Turk every 60 days. *See id*. ¶¶ 11-12. In March 2019, Ms. Mills contends that "A. A. Turk assigned her to work in Anadolu's Washington D.C. bureau." *Id*. ¶ 12. While working in Anadolu's Washington D.C. bureau, Ms. Mills' "job title remained the same"; she "received the same salary[;] and received the same benefits." *Id*. Ms. Mills alleges that she was "simultaneously employed by A. A. Turk," and Anadolu. *Id*. ¶ 13.

4

Ms. Mills asserts that as of July 31, 2019, she "had accrued but unused annual leave of 20 hours." *Id.* ¶ 14. Further, Ms. Mills alleges that between "March, 2019 and the end of her employment, [she] worked during several Turkish holidays and she earned [four] compensatory days of leave," which "brought her leave total (at the time of termination) to 24 days." *Id.* at 6 ¶ 14. According to Ms. Mills, on April 18, 2019, she emailed "Kim Adams, [a] Senior Newsroom Coordinator, employed by A. A. Turk, to inquire about the remaining balance of her available paid leave." *See* Am. Compl., ECF No. 10 at 6 ¶ 15. Ms. Adams allegedly responded, "'You should have only used 8 annual leave days, so presumably you [sic] still have 12 Days remaining to use. Your leave balance will renew on May 15, 2019 . . . .'" *Id.*

Ms. Mills alleges that she was discharged by Anadolu and A. A. Turk on July 29, 2019 when she received an "email from Mehmet Ali Sevgi, who works at Anadolu's D.C. Bureau, telling her [that] A. A. Turk was not renewing her most recent Consultancy Agreement executed on June 1, 2019." *Id.* at 6 ¶ 16. Further, Ms. Milles asserts that Mr. Mehmet "orally instructed [her] not to return to work after that day (July 29, 2019), even though the Consultancy Agreement did not end until July 31, 2019."

According to Ms. Mills, she is owed the "full value of the accrued but unused leave ($14,555.52) plus an amount equal to three times the value of the unpaid leave as liquidated damages

($43,666.56), [for] a total of $58,222.08." *Id.* at 7 ¶ 21. In addition, Ms. Mills claims that since she "did not receive payment of her wages for the month of July, 2019 (the gross amount of $10,916.67) until August 24, 2019, which was 17 working days after the August 1, 2019 due date . . . Anadolu must pay liquidated damages in the amount of 1.7 times the amount of the wages, which is $18,558.34." *Id.* ¶ 22.

### B. Procedural History

On October 14, 2019, Ms. Mills filed the current action. *See* Compl., ECF No. 1. After Anadolu moved to dismiss the initial complaint on January 9, 2020, *see* Def.'s First Mot. to Dismiss, ECF No. 8, Ms. Mills filed an Amended Complaint on January 28, 2020. *See generally* Am. Compl., ECF No. 10. Anadolu then filed its current motion to dismiss the Amended Complaint on February 11, 2020, *see* Def.'s Second Mot. to Dismiss ("Def.'s Mot."), ECF No. 12; and Ms. Mills filed her opposition brief on March 25, 2020, *see* Pl.'s Opp'n, ECF No. 18. Anadolu then filed its reply brief on April 1, 2020. *See* Def.'s Reply, ECF No. 19. The motion is ripe and ready for the Court's adjudication.

## II.  Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that

6

the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2),

"in order to give the defendant fair notice of what the . . .

claim is and the grounds upon which it rests." *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and

internal quotation marks omitted).

A complaint survives a Rule 12(b)(6) motion only if it

"contain[s] sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*,

550 U.S. at 570). A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw

[a] reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint

alleging facts which are "'merely consistent with' a defendant's

liability . . . 'stops short of the line between possibility and

plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*,

550 U.S. at 557).

Though at the motion to dismiss stage, the Court generally

will accept the plaintiff's factual allegations as true and give

the plaintiff the benefit of all inferences that can reasonably

be drawn from the allegations, *see Browning*, 292 F.3d at 242;

the Court need not accept inferences drawn by the plaintiff if

such inferences are unsupported by the facts set out in the

complaint or legal conclusions cast in the form of factual

allegations. *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004). "Nor must [the Court] accept as true the plaintiff's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Id.* (citing *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir.2002)).

## III. Analysis

Anadolu argues that Ms. Mills's action should be dismissed because she has failed to state a claim under the DCWPCL. *See* Def.'s Mot., ECF No. 12-1 at 12.[3] DCWPCL requires, *inter alia*, that upon an employee's discharge, "the employer shall pay the employee's wages earned not later than the working day following such discharge." D.C. Code § 32-1303(1). However, if "an employee (not having a written contract of employment for a period in excess of 30 days) quits or resigns, the employer shall pay the employee's wages due upon the next regular payday or within 7 days from the date of quitting or resigning, whichever is earlier." D.C. Code Ann. § 32-1303(2). As Anadolu is the only defendant in this action, prior to evaluating any of Ms. Mills' claims against the entity under DCPCWL, the Court must first establish that there was an "employer-employee

---

[3] Anadolu advances two other arguments for dismissal: (1) *forum non conveniens*, *see* Def.'s Mot., ECF No. 12-1 at 6; and (2) personal jurisdiction, *see id.* at 9. Because the Court finds that Ms. Mills has failed to state a claim under the DCWPCL, it need not reach Anadolu's other arguments.

relationship" between Anadolu and Ms. Mills. *See Harris v. Med. Transportation Mgmt.,* Inc., 300 F. Supp. 3d 234, 240 (D.D.C. 2018).

"Because the DCWPCL and the [Fair Labor Standards Act ("FLSA")] contain nearly identical provisions with respect to employers' liability, the DCWPCL is to be construed consistently with the FLSA." *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5 n. 2 (D.D.C. 2010)). Similar to the FLSA's definition, *see* 29 U.S.C. §§ 203(e)(1), DCWPCL defines an "employee" as "any person suffered or permitted to work by an employer," D.C. Code Ann. § 32-1301(2). The Supreme Court, in analyzing the FLSA, has held that "'economic reality' rather than 'technical concepts' [shall] be the test of employment." *See Goldberg v. Whitaker House Co-op.*, Inc., 366 U.S. 28, 33 (1961). To test the economic reality of the parties' employer-employee relationship, the Court looks at several factors:

> [W]hether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment . . .(4) maintained employment records. . . . [In addition, a court may also examine] [5] the degree of control exercised by the employer over the [employee], [6] the [employee's] opportunity for profit or loss and their investment in the business, [7] the degree of skill and independent initiative required to perform the work, [8] the permanence or duration of the working relationship and [9] the extent to which the work is an integral

part of the employer's business.
*Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11
(D.C. Cir. 2001)(citing *Henthorn v. Department of Navy*, 29 F.3d
682, 684 (D.C.Cir.1994); *Brock v. Superior Care, Inc.*, 840 F.2d
1054 (2d Cir.1988)). "No one factor standing alone is
dispositive and courts are directed to look at the totality of
the circumstances and consider any relevant evidence." *Morrison*,
253 F.3d at 11 (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d
132, 139 (2d Cir. 1999), *holding modified by Zheng v. Liberty
Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003)). "[T]he final and
determinative question must be whether the total of the testing
establishes the personnel are so dependent upon the business
with which they are connected that they come within the
protection of the [DCWPCL] or are sufficiently independent to
lie outside its ambit." *Morrison*, 253 F.3d at 11 (citing *Usery
v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir.1976)).

Ms. Mills argues that Anadolu and A. A. Turk "are a single
employer because they perform interrelated operations for a
common purpose." Am. Compl., ECF No. 10 at 1–2 ¶ 1. Further, she
alleges that "[b]oth entities are also under common management
and financial control which is centralized in A. A. Turk's
headquarters in Turkey [and] [a]s a single employer, Anadolu and
A. A. Turk are regarded as a single entity and each is liable
for the actions of the other." *Id*. Ms. Mills contends that both

10

entities (1) "suffered or permitted" her to work, *see id.* at 2 ¶ 2; (2) "had the power to hire and fire" her, *id.*; and (3) "supervised" and "directed" her work, *id.* Further, Ms. Mills states that "A. A. Turk performed the human resources function on its own behalf and on behalf of Anadolu because it paid [Ms. Mills] her salary and administered her employment benefits" and "A. A. Turk provided her with a work space [before she arrived into D.C.] but beginning in March 2019, Anadolu provided [her] work space at the D.C. Bureau [as well as] provided her with the tools and materials necessary to perform her job in D.C." *Id.* She goes on to allege that Anadolu "had control over the work [she] performed," *id.* at 3 ¶ 3; (2) "had control over her hours of work and made [her] work schedule," *id.*; and (3) "made the work rules that [she] was obligated to follow," *id.*

Anadolu argues that Ms. Mills is suing the wrong defendant in the wrong court. *See* Def.'s Mot., ECF No. 12-1 at 1. Noting that Ms. Mills entered a contract with A. A. Turk to "provide consulting services as an independent contractor for [A. A. Turk] from June 1, 2019 until July 31, 2019," *see id.* at 2; Anadolu contends that it "never employed [Ms.] Mills in the District of Columbia," *id.* at 4. It argues that it "is [a] separate and distinct legal entity from" A. A. Turk, with "separate bank accounts, payroll, telephone numbers employees, and offices." *Id.* Finally, Anadolu argues that it "never had any

employment relationship with [Ms.] Mills; never entered into a contract with [Ms.] Mills; never made any payment to [Ms.] Mills; and never transacted any business in the District of Columbia with [Ms.] Mills." *Id*. Anadolu then notes that neither it, "nor any of its employees, discharged or terminated [Ms.] Mills." *Id*.

In response, citing to *Harris*, 300 F. Supp. 3d at 240, Ms. Mills argues that, for purposes of DCPCWL, "Anadolu and A. A [Turk] jointly employed [her] under the economic reality test." Pl.'s Opp'n, ECF No. 18 at 21. She contends that "[j]oint employment can . . . be present in the case of a parent subsidiary relationship, where the operations of the two are related or intertwined." *Id*. Further, Ms. Mills argues that since "Anadolu is under the ownership and control of A. A. [Turk], [with] both entities perform[ing] interrelated operations for a common purpose, [and] are under common management . . . they are a single employer, each liable for the actions of the other." *Id*. Finally, she contends that "[i]ndependent contractor agreements have no bearing on whether a plaintiff is an employee or independent contractor." *Id*. at 22.

Anadolu replies that it has never employed Ms. Mills, and notes that the "[c]ontract" that Ms. Mills is suing under is between her and A. A. Turk. Def.'s Reply, ECF No. 19 at 15.

Anadolu states that, "[w]hile [it] recognizes the viability of a 'joint employer' theory, there are no facts here to support such a theory." *Id.* at 16. Anadolu observes that (1) "[n]owhere in the Amended Complaint does [Ms.] Mills allege that Anadolu had the power to hire and fire [her]," *id.*; (2) "it is undisputed that [Ms.] Mills was hired by [A. A. Turk]," *id.*; (3) "the individual that decided not to renew [Ms.] Mills' contract, Mehmet Ali Sevgi, was never employed by Anadolu," *id.*; and (4) "nowhere does [Ms.] Mills allege that Anadolu controlled the terms and conditions of [her] employment, determined the rate and method of [her] pay, and maintained [her] employment records," *id.* Finally, Anadolu avers that there is "no dispute that Anadolu and [A. A. Turk] maintained separate offices and management." *Id.*

The Court is unpersuaded that Ms. Mills has alleged facts to establish that she was employed by A. A. Turk's subsidiary, Anadolu, under the theory of joint employer liability. "The doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees and only evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary is sufficient to establish a joint employer relationship." *In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 338 (W.D. Pa. 2010)

13

(internal quotation marks and brackets omitted)(citing *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir.1997), *aff'd*, 683 F.3d 462 (3d Cir. 2012)). Here, Ms. Mills attempts to hold the subsidiary liable for the alleged actions of the nonparty parent company. The ultimate question when reviewing cases of "joint" or "parent-subsidiary" liability is one of "control." *See Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 114 (D.D.C. 2015), *aff'd*, 653 F. App'x 3 (D.C. Cir. 2016) (noting that both judicial tests for conducting a "joint employment inquiry," found in *Spirides v. Reinhardt*, 613 F.2d 826, 831–32 (D.C.Cir.1979) and *NLRB v. Browning-Ferris Indus. Of Pennsylvania, Inc.*, 691 F.2d 1117, 1123 (3d Cir.1982)), involve questions of "control"). None of the cases Ms. Mills cites to, relevant to joint employment, involve a complainant prevailing in a claim against a subsidiary based on the control of a nonparty parent. *See Harris*, 300 F. Supp. 3d at 236-39 (the defendant drivers claimed that a "general contractor" was "legally liable for their unpaid wages . . . under federal and local laws," because they alleged that the general contractor "control[ed] their 'daily operations'" as part of the general contractor's authority over the drivers' subcontractor employers); *Perry v. Int'l Bhd. of Teamsters*, 247 F. Supp. 3d 1, 14 (D.D.C. 2017) (the plaintiff alleged DCWPCL violations against his direct employer, but the court found that his

14

position was exempt from the wage statute); *Flannigan v. Vulcan Power Grp., LLC*, 642 F. App'x 46, 52 (2d Cir. 2016) (the plaintiff, an employee of a subsidiary company, brought a claim against the parent company and one of its officers for wage violations where the defendants admitted to having the power to hire, fire and supervise the employee); *Jackam v. Hosp. Corp. of Am. Mideast*, 800 F.2d 1577, 1580 (11th Cir. 1986) (employees of a subsidiary company brought claims against a parent company, based on the theory that the subsidiary was an agent of the parent, making the parent a joint employer of the employees).

In *Saint-Jean v. D.C. Pub. Sch. Div. of Transp.*, 815 F. Supp. 2d 1 (D.D.C. 2011), plaintiffs, former District of Columbia Division of Transportation ("DOT") employees, attempted to hold their DOT supervisor liable for their FLSA claims. Plaintiffs claimed that their supervisor could be considered their employer because "she 'was responsible for assigning overtime to DOT employees' and controlled the times at which drivers were to sign in and out." *Saint-Jean, 815 F. Supp. 2d*. at *4. In denying the motion for default judgment,[4] even though the defendant failed to properly respond to the complaint, the court found

---

[4] Similar to a motion to dismiss, a motion for default judgement involves the court centering its inquiry on the "well-pleaded allegations of the complaint." *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal and Glass, LLC*, 635 F.Supp.2d 21, 24 (D.D.C.2009).

that the "plaintiffs [pled] no facts showing that [the defendant] had the power to hire them," noting that "[i]ndeed, the plaintiffs themselves aver that '*DOT* hired' them . . . and that DOT subsequently employed them" *Id*. (emphasis in original). Further, the court found that the defendant "was authorized only to issue written warnings against plaintiffs . . . not to fire them outright." *Id*. Finally, the court observed that "the plaintiffs ma[de] no allegation that [the Defendant] determined the rate and method of payment or maintained employment records." *Id*.

Ms. Mills offers similarly insufficient allegations to establish Anadolu's liability as a subsidiary. However, alleging that the parent and subsidiary are regarded as a single entity and each is liable for the actions of the other does not allow the Court to make a plausible inference that the requisite control would flow from the from subsidiary to the parent.

The first factor of the economic reality test—power to hire and fire—weighs against Ms. Mills's claim. *Morrison*, 253 F.3d at 11. Ms. Mills argues that she was hired by A. A. Turk on "April 6, 2018, [when she] entered into an employment contract with A. A. Turk." Am. Compl., ECF No. 10 at 4 ¶ 8. She then states that this contract "set forth the terms of [her] employment, including . . . [her] annual salary and . . . benefits." *Id*. Ms. Mills adds that she signed a "fixed-term consultancy agreement"

16

that listed her and A. A. Turk as the parties, *id*. ¶ 10, and
would go on to sign a new consultancy agreement, still listing
herself and A. A. Turk as the parties, "approximately every 60
days" until she was discharged, *id*. 5 ¶ 11. Importantly, Ms.
Mills states "in early March, 2019, A. A. Turk assigned her to
work in Anadolu's Washington D.C. bureau." *Id*. 5 ¶ 12. At no
point does Ms. Mills provide any facts that indicate that
Anadolu had any power to hire her, and based on her statement
that A. A. Turk *assigned* her to Anadolu's office, Anadolu seems
to have had little say in her placement as well. *See Saint-Jean*,
815 F. Supp. 2d at 4. Furthermore, although Ms. Mills alleges in
her Amended Complaint that she was "discharged by Mehmet Ali
Sevgi, an employee of Anadolu who worked at the D.C Bureau," Am.
Compl., ECF No. 10 at 2 ¶ 2; in her Opposition, and after
Anadolu's declaration that Mehmet Ali Sevgi was not an employee
of Anadolu, Ms. Mills states that she was terminated by "Mehmet
Ali Sevgi, who physically worked at Anadolu's D.C. office,"
Pl.'s Opp'n, ECF No. 18 at 31. Ms. Mills does not dispute
Anadolu's contention that he is an employee of A. A. Turk.

The third factor—determination of the rate and method of
payment—also weighs against Anadolu's liability. *Morrison*, 253
F.3d at 11. After she began working in Anadolu's location, Ms.
Mills states that (1) "her job title remained the same," Am.
Compl., ECF No. 10 at 5 ¶ 12; and (2) she received the "same

salary and received the same benefits," *id.*; which indicates that Anadolu exhibited no control over her the conditions of her employment or her rate of pay. Ms. Mills states that "A. A. Turk performed the human resources function on its own behalf and on behalf of Anadolu because it paid [Ms. Mills] her salary and administered her employment benefits," *Id.* at 2 ¶ 2; but admits that it was A. A. Turk that administered her salary and benefits, as she never provides any facts indicating how Anadolu exerted any control over those important aspects of her employment.

The fourth factor—the maintenance of employment records—provides further weight against Anadolu's liability. *Morrison*, 253 F.3d at 11. Ms. Mills acknowledges that, when attempting to determine how many leave days she had accrued, while physically working at Anadolu's Washington D.C. location, she reached out to "Kim Adams, [a] Senior Newsroom Coordinator, *employed by A. A. Turk*, to inquire about the remaining balance of her available paid leave." *See* Am. Compl., ECF No. 10 at 6 ¶ 15 (emphasis added).

Further, a final factor—the permanence or duration of the working relationship—also weighs against Anadolu's liability, because, as noted above, it was A. A. Turk who (1) was a party to the initial offer letter, (2) required several consultancy agreements which specified the employment periods, (3) assigned

her to Anadolu's office, and (4) employed the representative that notified Ms. Mills that her contract would not be renewed.

To be sure, Ms. Mills did make several allegations that directly reference Anadolu, but the Court finds those allegations unavailing as they were "formulaic recitation[s] of the elements" of the "economic reality" test. *See Twombly*, 550 U.S. at 555. Though, Ms. Mills, citing *Harris*, 300 F. Supp. 3d at 243, notes that "defeating a claim [based on joint, single, or parent-subsidiary theories] at the motion to dismiss stage is no easy task," it is not impossible. *See Attanasio v. Cmty. Health Sys.*, Inc., 863 F. Supp. 2d 417 (M.D. Pa. 2012); *Coffen v. Washington Convention & Sports Auth.*, 271 F. Supp. 3d 211 (D.D.C. 2017); *Al-Quraan v. 4115 8th St. NW, LLC*, 113 F. Supp. 3d 367 (D.D.C. 2015); *Arencibia v. 2401 Rest. Corp.*, 699 F. Supp. 2d 318 (D.D.C. 2010).

*Attanasio* is particularly instructive because in that case, as in this case, where the plaintiffs provided generalized statements of FLSA liability against the parent company for the actions of the wholly-owned subsidiary, even though the parent company did not own the subsidiary during the time most of the claims arose, *see Attanasio*, Inc., 863 F. Supp. 2d at 419; the court found the plaintiffs' allegations to be "conclusory and implausible," *id.* at 425. As part of its finding, the court noted that plaintiffs' "allegations establishing employer

19

control by the [subsidiary] and later [by the parent company
were] effectively identical," and observed that the duplicate
allegations "foreclose[d] the possibility that the[] pleadings
[were] particularized and demonstrate[d] that the[] allegations
[were] devoid of any actual factual support." *Id*. Further, the
court stated that "even beyond that these pleadings are
boilerplate, is that there are no operative details suggesting
exactly *how* [the parent company] exercised authority over the
particular employees, *how* these employees were supervised by
[the parent company]. . . and *how* they oversaw the
administration of the business records." *Id*.(emphasis in
original). "Such details are the backbone of a well-pleaded
allegation." *Id*. at 424.

In this action, Ms. Mills alleges that Anadolu and A. A.
Turk, which is not a party in this case, "both 'suffered or
permitted' [her] to work," Am. Compl., ECF No. 10 at 2 ¶ 3;
"both entities had the power to hire and fire," *id*.; and "both
entities supervised" her work, *id*. Lumping both the parent and
subsidiary company together with the elements of the "economic
reality" test is not sufficient to state a plausible allegation
for the subsidiary's liability. Even in *Jackam*, cited by Ms.
Mills, the court found the plaintiffs' allegations sufficient
when they included such details as the subsidiary company
"execut[ing] personnel and labor relations polic[ies]

established by the parent corporation"; the parent company
"actively recruit[ed] individuals" to the subsidiary; and the
parent company even "drafted the employee relations manual" for
the subsidiary. *See* 800 F.2d at 1580. The only fact Ms. Mills
includes in her allegations that weigh in favor of Anadolu's
liability was that she "was supervised by Maxine Hughes who is
employed by Anadolu." Compl., ECF No. 10 at 5 ¶ 12.

No one factor is dispositive in determining whether an
employer-employee relationship exists. But viewing the totality
of the circumstances—(1) Ms. Mills was hired by A. A. Turk; (2)
A. A. Turk paid Ms. Mills's wages and administered her benefits
throughout her entire period of employment; (3) A. A. Turk
assigned her to Anadolu's office; (4) A. A. Turk remained the
only party to Ms. Mills's alleged employment contracts; and (5)
an A. A. Turk employee informed her of her alleged discharge—the
Court must conclude that Anadolu was not Ms. Mills's employer
for the purposes of DCPCWL liability. *See Morrison*, Inc., 253
F.3d at 11.

## IV.    Conclusion

For the reasons set forth above, the Court **GRANTS** Anadolu's Motion to Dismiss, ECF No. 12. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
               **United States District Judge**
               **November 24, 2020**